UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ANASHA BACCHUS,

                      Plaintiff,

    -against-

SCO FAMILY OF SERVICES,

                      Defendant.
----------------------------------------------------------X

Case No.: 1:22-cv-02232

**COMPLAINT**

Plaintiff Demands a
Trial by Jury

Plaintiff, Anasha Bacchus, by and through her attorneys, Phillips & Associates, PLLC, hereby complains of the Defendant, upon information and belief, as follows:

## NATURE OF THE CASE

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §2000e et seq. ("Title VII"), and to remedy violations of the New York State Executive Law and the Administrative Code of the City of New York, based upon the supplemental jurisdiction of this Court pursuant to *Gibbs*, 38 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking damages to redress the injuries she has suffered as a result of being harassed and discriminated against by Defendant SCO on the basis of her sex/gender, together with sexual harassment, creating a hostile work environment, retaliation, and constructive discharge.

## JURISDICTION AND VENUE

2. The Court has jurisdiction pursuant to 42 U.S.C. §2000e et seq., 28 U.S.C. §1331, §1343, and supplemental jurisdiction thereto.

3. This action involves a Question of Federal Law.

4. Venue is proper in this district based upon the fact that a substantial part of the events and omissions giving rise to the claim occurred within the Eastern District of New York. 28 U.S.C. §1391(b).

5. On or about August 26, 2021, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

6. On or about January 27, 2022, Plaintiff received a Right to Sue Letter from the EEOC.

7. This action is brought within ninety (90) days of said Notice of Right to Sue Letter.

## PARTIES

8. Plaintiff is a female resident of the State of New York, County of Kings.

9. At all times material, Defendant SCO FAMILY OF SERVICES (hereinafter also referred to as "SCO") was and is a domestic not-for-profit corporation duly incorporated under the laws of the State of New York.

10. At all times material, Defendant SCO was and is an organization that provides personal and social services to children, teens, and young adults, including foster care, medical care, education, employment, and housing services in Long Island, Brooklyn, Queens, and the Bronx.

11. At all times material, Defendant SCO operated a residential group home called "The Hard to Place (HTP) Agency Operated Boarding Home – Park Place," which is located at 1258 Park Pl, Brooklyn, NY 11213 ("Park Place").

12. At all times material, Plaintiff was an employee of Defendant SCO.

## MATERIAL FACTS

13. On or about February 15, 2015, Plaintiff began working for Defendant SCO as a "Childcare Worker" at its Park Place location. Based on her strong performance, Plaintiff was later promoted to a "Senior Childcare Worker." In her role, Plaintiff was responsible for supervising male foster care children with developmental disabilities with their day-to-day activities.

14. Shortly after beginning her employment with Defendant SCO, Program Manager Efosa Idemudia, who was Plaintiff's supervisor, began to sexually harass Plaintiff at work.

15. On a near-daily basis, Mr. Idemudia would make inappropriate sexual comments to Plaintiff.

16. For example, Mr. Idemudia would frequently tell Plaintiff that he wanted to "take [her] out to dinner." Mr. Idemudia also told Plaintiff on several occasions that he "want[ed] to be [her] man," and that she was not allowed to date other people while she was working for him.

17. On one occasion, Mr. Idemudia told Plaintiff that he wished he "**would have fucked [Plaintiff] before [he] hired her**."

18. In addition to the inappropriate sexual comments, and to show that he viewed women as subordinate to men, Mr. Idemudia would also require Plaintiff to perform demeaning tasks. For example, Mr. Idemudia asked Plaintiff to leave work every Friday to buy him Hennessey. If Plaintiff objected to this task, Mr. Idemudia threatened to take Plaintiff off the schedule. Plaintiff reasonably believed that she would lose her job if she did not comply.

19. In or around 2019, Plaintiff complained to Mr. Idemudia's supervisor, Program Director Sybrina Richardson, about Mr. Idemudia's workplace harassment. Instead of putting a stop to the harassment, Ms. Richardson told Plaintiff to "ignore" Mr. Idemudia, and to "give [Mr. Idemudia] a couple of days and he'll calm down." Because Ms. Richardson was a close friend of Mr. Idemudia, she swept Plaintiff's complaint under the rug.

20. Shortly after, Plaintiff escalated her complaint to Vice President Dianne Krasnoff. Similarly, Ms. Krasnoff swept Plaintiff's complaint under the rug, and told Plaintiff that "I don't see the issue, because [Mr. Idemudia] speaks highly of you in the office."

21. On or about January 30, 2020, Jonathan McLean took over as Defendant SCO's "Vice President."

22. On or about February 6, 2020, Plaintiff met with Mr. McLean and complained about Mr. Idemudia's sexually inappropriate remarks toward her. After the meeting, Plaintiff asked Mr. McLean not to mention Plaintiff's complaint to Ms. Richardson because she had already failed to address it. Plaintiff also feared that Ms. Richardson would retaliate against Plaintiff if she learned that Plaintiff went "over her head" to Mr. McLean.

23. Mr. McLean assured Plaintiff that he would not mention Plaintiff's complaint to Ms. Richardson. Mr. McLean also requested that Plaintiff send along any text messages that Mr. Idemudia sent her with sexual or demeaning language. Plaintiff complied and sent the relevant texts.

24. On or about February 11, 2020, after Mr. McLean escalated Plaintiff's complaint to Defendant SCO's HR Department, Mr. Idemudia was suspended.

25. The next day, on or about February 12, 2020, Director of HR Nicole Tate, interviewed Plaintiff about her complaints against Mr. Idemudia.

26. During Mr. Idemudia's suspension, Defendant SCO's employees and managers, including Ms. Richardson, Program Manager Athia Johnson, and Program Manager Gwendolyn McBride, kept in regular contact with Mr. Idemudia during his suspension.

27. Shortly after Plaintiff's complaint to HR, at Mr. Idemudia's direction, Plaintiff's supervisors began to harass and retaliate against her.

28. For example, Ms. Johnson began as Plaintiff's new supervisor, and she refused to speak to Plaintiff directly about any of her tasks. Instead, Ms. Johnson would direct other staff members to pass along messages to Plaintiff. In fact, Terrell Brown, one of the childcare staff members, repeatedly asked Ms. Johnson to talk to Plaintiff directly, to no avail.

29. As another example, despite the suspension, Mr. Brown would tell Mr. Idemudia how Plaintiff was performing at work, and discuss any day-to-day occurrences at Defendant SCO.

30. In further harassment and retaliation, Mr. Brown told staff members and residents that Plaintiff made "false reports" about Mr. Idemudia in order to get him fired.

31. Around this time, Ms. Richardson and Mr. McLean held a staff meeting. Plaintiff learned that Mr. Brown contacted Mr. Idemudia directly to tell him what was said at the meeting.

32. To further harass and retaliate against Plaintiff, Mr. Brown repeatedly asked Defendant SCO's staff about Plaintiff's complaint of sexual harassment against Mr. Idemudia. **Mr. Brown also asked the staff how they felt about Plaintiff still working for Defendant SCO after her complaint.**

33. On or about February 14, 2020, Mr. Idemudia was terminated.

34. In further retaliation, that same day, and at Mr. Idemudia's direction, Ms. Johnson removed Plaintiff from the schedule.

35. So, Plaintiff immediately complained to Mr. McLean, Ms. Tate, and "VP of HR," Rebecca Lukeman about Ms. Johnson's retaliatory removal from the schedule.

36. In response to Plaintiff's complaint, Mr. McLean and Ms. Tate held a staff meeting where they officially announced Mr. Idemudia's termination. At the meeting, Mr. McLean announced that Ms. Johnson was being replaced with Ms. McBride.

37. That same day, after the meeting, Mr. Idemudia sent Plaintiff a sarcastic text message stating, "Thanks for everything, I really appreciate it." Plaintiff did not respond.

38. Shortly after Mr. Idemudia's termination, Defendant SCO's management began a campaign of harassment and retaliation against Plaintiff in order to justify her termination and/or cause her to be constructively discharged.

39. On or about February 24, 2020, Plaintiff complained to Ms. Tate and Ms. Lukeman about Mr. Brown's retaliatory actions. In an email, Plaintiff wrote:

> "I was told my name would not be repeated and no one would know I made allegations on [Mr. Idemudia], but it was and still is, Everyone knows it's me who made the allegations against him, [Mr. Idemudia] even called the residents and told them it was me. The residents are surprisingly not mad at me, in fact they have been check on me more to make sure I am ok and safe. I am asking for your assistance in this situation."

40. Despite Plaintiff's pleas for help from HR, the harassment and retaliation continued.

41. In or around the summer of 2020, Plaintiff applied for an open Program Manager position at Defendant SCO. Shortly after applying for the position, Ms. Richardson contacted Plaintiff and told her they had gone with a more qualified candidate, and Program Manager Jeffrey Booker was hired for the role.

42. Although Ms. Richardson told Plaintiff that Mr. Booker was hired because of his qualifications, Ms. Richardson asked that *Plaintiff* train him. Plaintiff realized that she had been denied the Program Manager position because of her complaints against Mr. Idemudia.

43. Throughout 2020, like Ms. Johnson before her, Ms. McBride made arbitrary and unfavorable changes to Plaintiff's schedule.

44. For example, Plaintiff normally worked from 8:00 a.m. to 4:00 p.m. Under Ms. McBride, Plaintiff's schedule was changed to the over-night shift, 12:00 a.m. to 8:00 a.m.

45. Ms. McBride told Plaintiff on several occasions that she was not permitted to clock out until she completed all her assignments, even if the assignments took her hours to complete outside

her scheduled shift. Plaintiff never received any overtime pay for the work that she performed beyond the end of her scheduled shift.

46. On or about December 4, 2020, Ms. McBride unexpectedly instructed Plaintiff to clock out *before* Plaintiff could finish one of her daily reports, so she could have a reason to accuse Plaintiff of performance issues and justify reprimanding her.

47. To create a paper trail of performance issues against Plaintiff, Ms. McBride text messaged Plaintiff and accused her of being "spiteful," failing to submit her daily report, and leaving her shift early.

48. On or about December 8, 2020, Plaintiff met with "Employee Relations Manager," Leigh Bradley, to complain about Ms. McBride's retaliatory actions.

49. Later that day, Plaintiff wrote a letter to Defendant SCO's HR Department, summarizing her complaints surrounding Defendant SCO that were not addressed in a morning meeting. In this letter, she wrote:

> "**Daily Report**: This is the manager's report and should be completed by the manager. I have been sending report every morning. But I received a text from [Project Manager] – [Ms. McBride] that I needed to clock out every morning and leave the program. Since the overnight (sleep in) does not vacate the office where the computer is until 8 a.m., there is no way for me to complete the report. When Ms. McBride realized I did not complete it she texted me numerous times informing me that I was being spiteful. How was I being spiteful when I was following her directive? I have also been going the monthly facility report since February to November. I've been holding my weight and doing childcare job in program and never made a fuss."

50. In or around the end of December 2020, in further retaliation, another Mr. Booker began reassigning Plaintiff's job responsibilities. For example, Mr. Booker told Plaintiff that she needed to share her responsibilities with "Senior Childcare Worker," Steven Foster.

51. On or about January 12, 2021, Ms. McBride gave Plaintiff her first negative performance review in the six (6) years that Plaintiff had been working for Defendant SCO. In the review,

7

Ms. McBride falsely wrote that Plaintiff "within recent weeks has declined in accepting supervision and effectively communicating supervisory issues with Program Manager."

52. In direct reference to Plaintiff's prior complaints against Mr. Idemudia, Ms. McBride also accused Plaintiff of failing to maintain "positive and effective relationships with her supervisors and co-workers."

53. In her written rebuttal to the retaliatory review, Plaintiff once again complained of the harassment and retaliation she faced at Defendant SCO from her supervisors and co-workers, including the schedule changes.

54. Plaintiff also complained:

> "My schedule was constantly being changed with immediate effect. I wasn't given 2 weeks' notice as is required by SCO. I went from [8 a.m. – 4 p.m.] to [12 a.m. – 8 a.m.] and the only form of communication is through emails and text messages. **When I clock out and leave [Park Place] at 8 a.m., I would the[n] receive emails and calls constantly from program managers and if I don't reply right away, I am called "unprofessional," "spiteful," and told that I need training**." […]
>
> **In my evaluation meeting [Mr. Booker] said he was told a lot about me, but he would make his own judgment of me. I feel his attitude is based on what he heard about me, as soon as he came into the program, he stripped me of all my Senior Child Care Worker responsibilities. . . When I met [Mr. Booker] in November 2020 his first statement to [me] was "oh you're [Plaintiff] I heard about you."**

55. In further retaliation for Plaintiff's complaints, Ms. McBride began to contrive a false narrative that Plaintiff was neglecting the residents and denying them food.

56. In or around April 2021, **Plaintiff learned from residents of Defendant SCO that Ms. McBride had asked them if Plaintiff had ever denied them food**. The residents stated that Ms. McBride asked the question a few times, and in different ways, in an effort to get the residents speak against Plaintiff.

57. In or around May 2021, former staff member, Cynthia Conyers, who had previously resigned from Defendant SCO, phoned current staff member, Talia (last name currently unknown), to speak about Plaintiff. Talia invited Plaintiff to listen to the call, and she put Ms. Conyers on speaker phone.

58. During the call, Ms. Conyers told Talia that Ms. McBride had asked her to write a letter stating that Plaintiff was the reason for her (Ms. Conyers') resignation. Ms. Conyers said she did not feel comfortable writing this letter, because the statement was not true.

59. On or about May 26, 2021, Plaintiff emailed HR Representative Yudesh Ramchand, and Ms. Tate to report Ms. McBride's request that Ms. Conyers write the false letter.[1]

60. Plaintiff wrote in her May 26, 2021, email to Ms. Tate and Mr. Ramchand:

> "I know [Defendant SCO] states there is no backlash for reporting or "whistleblowing" that is not true. Since I made my allegations against previous Supervisor, [Mr. Idemudia] I have been constantly targeted by [Ms. McBride]. **She is always making comments that he ([Mr. Idemudia]) was "her boy." I have called HR multiple times about the constant harassment I have been under since I reported previous PM [Mr. Idemudia] and he was relieved of his duties. I have been complaining that Park Place Managers are creating a hostile environment for me to work**."

61. Plaintiff emphasized again that there were times that Ms. McBride requested Plaintiff continue working after she clocked out, and when Plaintiff refused, Ms. McBride said Plaintiff "needed more training."

---

[1] In fact, back in October 2020, Plaintiff had written an email to Mr. Richardson and Ms. McBride regarding Ms. Conyers' "combative" attitude in taking direction from Plaintiff. Plaintiff forwarded this email to Ms. Bradley on May 26, 2021, to further support the claims she made in her email to Ms. Tate and Mr. Ramchand. In this email from October 2020, Plaintiff also wrote, "I just remembered she mentioned last weekend that she was nervous about coming to [Park Place] to train under me because of everything she heard about me (referring to her previous report about Mr. Idemudia) and me also being West Indian but she said CJ (supervisor at Defendant SCO and Ms. Conyer's brother) assured her I was a good person."

9

62. In this email, Plaintiff also reported the alleged incident from April 2021, wherein Ms. McBride asked residents if Plaintiff had ever denied them food. Plaintiff wrote:

    "[Ms. McBride] is constantly coming for my character and job. I do my job as [Senior Child Care Worker] and they have never found fault with my work until now. I do not appreciate she is now calling and asking [past] staff to write lies, so she can fire me."

63. Ms. Bradley told Plaintiff that they would be investigating these allegations made by Ms. McBride. However, each time Plaintiff asked for an update on this investigation, Ms. Bradley refused to provide one.

64. Despite Plaintiff's constant complaints regarding the harassment and retaliation she was facing, the harassment and retaliation continued.

65. For example, on or about June 3, 2021, Plaintiff was forced to work three shifts back-to-back. Plaintiff was scheduled to work the 8:00 a.m. to 4:00 p.m. shift. During her shift, she received an email requesting that she stay from 4:00 p.m. to 12:00 a.m. Plaintiff agreed.

66. However, at 12:00 a.m., Mr. Booker intentionally failed to arrive on time to his shift and did not respond to Plaintiff's messages. So, Plaintiff was forced to stay until 7:35 a.m. the next day. Plaintiff complained about Mr. Booker in an email to Ms. Richardson, Ms. Tate, Mr. Ramchand, Ms. McBride, and Mr. McLean that same morning. No action was taken in response to Plaintiff's complaint.

67. On or about June 14, 2021, one of Plaintiff's clients, resident B. B.[2] became upset with Plaintiff when he realized that she may be fired. **So, to stop Plaintiff from leaving the job, B.B. said that he would telephone the Justice Center and tell them what Ms. McBride and Mr. Booker instructed him to say**. When Plaintiff asked B.B. what he was told to say, **B.B. told**

---

[2] Name currently withheld for privacy reasons.

10

**Plaintiff that Ms. McBride and Mr. Booker asked him to call the Justice Center and report Plaintiff for abuse**. B.B. refused because it was not true.

68. Upon learning about Ms. McBride and Mr. Booker's retaliatory efforts, Plaintiff reported the incident to Ms. Tate.

69. However, after her numerous previous complaints had gone ignored, and the retaliation persisted, Plaintiff believed that filing another complaint was futile.

70. Then, Defendant SCO falsely accused Plaintiff of ordering personal supplies in a resident's name using a resident's card.

71. On or about June 14, 2021, after this final retaliatory act, Plaintiff was constructively discharged from Defendant SCO.

72. On or about August 26, 2021, Plaintiff filed a charge of discrimination and retaliation with the EEOC.

73. During the EEOC's investigation, and in post-termination retaliation, Defendant SCO alleged that Plaintiff had used the resident's funds to buy personal items, and that Plaintiff resigned in order to avoid any possible consequences.

74. However, Plaintiff disputed each alleged incident of theft by producing evidence of receipts of purchase for the purportedly "personal items," as well as photos of where the alleged "personal items" were still being used at Defendant SCO after her resignation.

75. The above are just some examples of the harassment and discrimination that Plaintiff endured while working for Defendant SCO.

76. Defendant SCO constructively discharged Plaintiff in retaliation for her complaints of workplace harassment.

77. Defendant SCO's employees would not have harassed Plaintiff but for her sex/gender.

78. Defendant's employees would not have retaliated against Plaintiff but for her opposition to Defendant SCO's unlawful employment practices.

79. As a result of Defendant SCO's actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

80. As a result of Defendant SCO's discriminatory and intolerable treatment of Plaintiff, she suffered and continues to suffer severe emotional distress and physical ailments.

81. As a result of the acts and conduct complained of herein, Plaintiff has suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

82. As Defendant SCO's conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages.

## AS A FIRST CAUSE OF ACTION
## UNDER TITLE VII
## **DISCRIMINATION**

83. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

84. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964; 42 U.S.C. Section(s) 2000e et Seq., as amended, for relief based upon the unlawful employment practices of the above-named Defendants. Plaintiff complains of Defendant SCO's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's sex.

85. Defendant SCO engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by discriminating against Plaintiff because of her sex, together with sexual harassment, creating a hostile work environment, and constructive discharge.

## AS A SECOND CAUSE OF ACTION
## UNDER TITLE VII
## **RETALIATION**

86. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

87. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be an unlawful employment practice for an employer:

> "(1) to…discriminate against any of his employees…because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

88. Defendant SCO engaged in an unlawful employment practice prohibited by 42 U.S.C. §2000e *et seq.* by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment, because of her opposition to its unlawful employment practices.

## AS A THIRD CAUSE OF ACTION
## UNDER STATE LAW
## **DISCRIMINATION**

89. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

90. Executive Law § 296 provides that "1. It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's . . . sex. . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

91. Defendant SCO engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her sex, together with sexual harassment, creating a hostile work environment, retaliation, and constructive discharge.

92. Plaintiff hereby makes a claim against Defendant SCO under all of the applicable paragraphs of Executive Law Section 296.

## AS A FOURTH CAUSE OF ACTION
## UNDER STATE LAW
## **RETALIATION**

93. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

94. New York State Executive Law §296(7) provides that it shall be an unlawful discriminatory practice:

> "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person before he has opposed any practices forbidden under this article."

95. Defendant SCO engaged in an unlawful and retaliatory discriminatory practice by retaliating, and otherwise discriminating against Plaintiff because of her opposition to Defendant SCO's unlawful employment practices.

## AS A FIFTH CAUSE OF ACTION
## UNDER THE NEW YORK CITY ADMINISTRATIVE CODE
## **DISCRIMINATION**

96. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

97. The Administrative Code of City of New York, Title 8, §8-107 [1] provides that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee of agent thereof, because of the … gender … of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

98. Defendant SCO engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff on the basis of her gender, together with sexual harassment, creating a hostile work environment, and constructive discharge.

**AS A SIXTH CAUSE OF ACTION**
**UNDER THE NEW YORK CITY ADMINISTRATIVE CODE**
**<u>RETALIATION</u>**

99. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraph of this Complaint as if more fully set forth herein at length.

100. New York City Administrative Code Title 8-107(7) provides that:

> "It shall be an unlawful discriminatory practice for any person in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter …"

101. Defendant SCO engaged in an unlawful and retaliatory practice by retaliating, and otherwise discriminating against the Plaintiff because she opposed Defendant SCO's unlawful employment actions.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A. Declaring that the Defendant engaged in unlawful employment practices prohibited by Title VII, the New York State Executive Law, and the Administrative Code of the City of New York and that Defendant discriminated against Plaintiff on the basis of her sex/gender, together with sexual harassment, creating a hostile work environment, retaliation, and constructive discharge;

15

B. Awarding damages to the Plaintiff, retroactive to the date of discharge, for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendant SCO's unlawful discharge and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of this action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant SCO's unlawful employment practices.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff demands judgment against the Defendant, in an amount to be determined at the time of trial, plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:  April 19, 2022
       New York, NY

By:   */s/ Silvia C. Stanciu, Esq.*
       **Phillips & Associates, PLLC**
       *Attorneys for Plaintiff*
       45 Broadway, Suite 430
       New York, NY 10006
       212-248-7431
       sstanciu@tpglaws.com